545 A.2d 7

**In the Matter of the Application of CHARLES M. for Admission to the Bar of Maryland.**

**Misc. No. 15, Sept. Term, 1987.**

**Court of Appeals of Maryland.**

Aug. 1, 1988.

James H. Taylor, Landover, for appellant.

No argument on behalf of appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired) Specially Assigned.

COLE, Judge.

In this case we are asked to decide whether the petitioner, C.M., has satisfied his burden of proving present good moral character which is a condition precedent to his admission to the Maryland Bar.[1]

C.M. filed his application for admission to the Maryland Bar on March 30, 1984. The application revealed that he had been arrested in 1977 on a charge of fraud by check, was involved in several lawsuits, and had filed for personal bankruptcy in 1982.

On May 14, 1984, the State Board of Law Examiners (Board) received a letter from Jerome A. Kuta, Esq., advising the Board of alleged improprieties committed by C.M. in

---

**1.** Rule 2 of the Maryland Rules Governing Admission to the Bar states in pertinent part:

"The applicant shall at all times have the burden of proving his good moral character before the Character Committee, the Board and the Court...."

the United States Bankruptcy Court for the District of Maryland. Mr. Kuta attached a copy of a memorandum opinion authored by Judge Paul Mannes which stated that C.M. "appears to have a good grasp of accomplishing delay through bankruptcy filings." Moreover, the judge found that C.M.'s "Chapter 7 [bankruptcy] filing was abusive and in bad faith."

Contemporaneously, the Board notified the Character Committee for the Seventh Judicial Circuit of C.M.'s application and the Character Committee assigned Ronald Willoner, Esq., to interview him. Mr. Willoner, however, promptly notified the Character Committee of a conflict of interest. Specifically, a partner in his law firm currently represented a client, Steinar Marteinsson, who had filed suit against C.M. Accordingly, the Character Committee selected Carlton Green, Esq., to interview C.M. on July 23, 1984. Mr. Green advised the Character Committee that he had reservations about recommending the admission of C.M. to the Bar and requested that the matter be considered by the Character Committee as a whole.

A Character Committee panel consisting of David A. McNamee (Chairman), Mr. Willoner, Mr. Green, and John H. Briscoe, convened on September 6, 1984. C.M. appeared without counsel and was questioned in regard to three areas of particular concern: (1) the criminal case pending in Howard County against C.M. for fraud by check; (2) the bankruptcy matter brought to the Character Committee's attention by Mr. Kuta; and (3) the civil suit filed against C.M. by Mr. Steinar Marteinsson alleging the conversion of $25,000.

In regard to his arrest for fraud by check, C.M. explained that in 1975 he had purchased carpet for installation in a house he was constructing in Howard County. When he arrived at the house the day after installation, the carpet had been removed and he suspected that the installers had come back the previous evening and stolen the carpet. He then issued a check to the same carpet company to purchase replacement carpet and stopped payment on the check after

receiving delivery of the new carpet. C.M. admitted that he was not certain who had removed the carpet and that he had stopped payment on the check so as not to pay the company twice. Further questioning revealed that C.M. sold the house shortly thereafter and utilized the proceeds "to live on." He never attempted to pay for the replacement carpet before he was arrested in 1977. At that point, he agreed to satisfy the debt by making eleven monthly installment payments. C.M. testified that he was currently having the matter expunged from his record.

The factual setting relating to C.M.'s bankruptcy was more complex. C.M. explained that in the late 1960's several persons joined in the formation of the Metro America Corporation for the purpose of real estate development and named C.M. president. Metro America subsequently acquired a piece of property on Hill Road in Prince George's County, Maryland. This property was encumbered by two deeds of trust: the first deed of trust was held by Mr. and Mrs. Clarence Carroll, while the second deed of trust was held by Mr. Eugene Thomas.

As the real estate market declined, Metro America ceased to operate and its charter was forfeited in 1975. In 1977, without any authorization from the other principals of Metro America, C.M. deeded the Hill Road property to himself as compensation for salary earned over the years.

In 1982, C.M. fell behind on payments to the first trust and foreclosure proceedings were instituted. At this time, C.M. and his wife filed a Chapter 13 bankruptcy petition and the foreclosure actions were stayed. In order to protect his interest in the property, the owner of the second trust, Mr. Thomas, purchased the first trust and entered into a consent order with C.M. which required that C.M. pay Mr. Thomas $653.00 per month.

By November, 1983, C.M. was late in making payments to Mr. Thomas. The possibility of foreclosure notwithstanding, C.M. entered into an installment contract in December, 1983, to sell the Hill Road property to another couple. The

purchasers had given C.M. $1,000 in cash and a $1,500 promissory note as down payment and agreed to make monthly payments of $653.00 per month thereafter.

In light of C.M.'s default, however, Mr. Thomas moved to have the foreclosure stay lifted, which was accomplished on January 6, 1984. A foreclosure sale was subsequently scheduled for May 4, 1984. In response, C.M., with the advice of counsel, filed a Chapter 7 bankruptcy petition on behalf of Metro America Corporation on March 2, 1984. The Bankruptcy Court, however, lifted the foreclosure stay and imposed sanctions against C.M.'s attorney, Richard McGill, Esq. During questioning before the Character Committee, C.M. admitted that this bankruptcy petition was filed to delay foreclosure on the Hill Road property.

Finally, C.M. was questioned as to the substance of allegations in the Marteinsson suit that he had converted $25,000. C.M. denied the allegations *in toto*. Following this hearing, the Character Committee unanimously agreed that C.M. should not be recommended for admission to the Maryland Bar. The Character Committee filed a formal report to this end on October 30, 1984.

This same panel held a supplementary hearing on November 21, 1985, to allow C.M. to present additional information in regard to the issues raised in the previous hearing and to consider a new matter that had come to the Character Committee's attention in the interim. Albert Wynn, Esq., represented C.M. at this hearing.

The Character Committee had learned that C.M. had filed suit seeking damages for injuries he had received in an automobile accident which occurred in September, 1977. The trial in that matter had been held in September, 1985, and while under oath during those proceedings C.M. admitted that he had given false testimony in a deposition in 1984. A transcript of the trial proceedings revealed that C.M. made no attempt to explain why the 1984 deposition testimony was false.

The false testimony related to whether C.M. had sustained original injuries in the accident of September, 1977, or whether those injuries were aggravations of pre-existing conditions. C.M.'s testimony before the Character Committee revealed that C.M. had been involved in an accident in 1974 in which he injured his left shoulder and back. During the 1984 deposition, however, C.M. testified that he had only injured his left shoulder in this accident. C.M. admitted this inconsistency during the 1985 trial. In addition, C.M. injured his right knee, neck, right shoulder, and back in an accident in June, 1977. These injuries were the subject of litigation in 1981. During the 1984 deposition C.M. testified that he sustained injuries to his right knee, neck, right shoulder, and back in the accident of September, 1977. C.M. specifically denied ever having injured his right shoulder and back prior to September, 1977. At the 1985 trial, however, C.M. admitted that this testimony was false; the injuries to his right shoulder and back were aggravations of injuries sustained in 1974 and June, 1977.

The Character Committee was concerned that C.M. had committed perjury during the 1984 deposition and sought an explanation for the false testimony. C.M. began by explaining that he was not prepared for the 1984 deposition because he had failed to review the pertinent medical records beforehand. C.M. advised the Character Committee that the deposition testimony was not false but only incomplete. When questioned as to why he did not explain the reason for the inconsistencies during the 1985 trial, C.M. responded that although he did not know it at the time, he was ill as the result of consuming contaminated drinking water prior to the trial and was unable to think clearly.

Next, the Character Committee reviewed the issues discussed at the previous hearing. At this time, counsel for C.M. asserted that Mr. Willoner should remove himself from the Character Committee panel in light of his firm's involvement in the Marteinsson case. Mr. Willoner apparently refused to disqualify himself. Later, Chairman McNamee ruled that since Mr. Willoner did not participate

directly in the Marteinsson litigation he would not be disqualified.

C.M. presented evidence demonstrating that· expungement proceedings in regard to his arrest for fraud by check had been completed on October 5, 1984. Counsel asserted that C.M. stopped payment because of a disagreement with the supplier of the carpet.

In regard to the bankruptcy proceedings, C.M. argued that he was acting under advice of counsel in regard to both his personal bankruptcy (Chapter 13) and the bankruptcy of Metro America (Chapter 7). Therefore, any abuse of those proceedings was solely the responsibility of his counsel. C.M. also took the position that his personal bankruptcy should not reflect negatively on his integrity but was simply a hazard associated with the real estate development business. In addition, C.M. argued that he had not converted funds as suggested by Judge Mannes because he was not in a fiduciary relationship with Mr. Thomas but merely had a debt obligation. Finally, C.M. emphasized that the Marteinsson suit never amounted to more than mere allegations and was settled without any legal determination of liability.

The Character Committee submitted a report dated February 20, 1986, in which it unanimously reaffirmed its prior decision that it could not recommend C.M. for admission to the Maryland Bar. This report emphasized that the Character Committee rejected C.M.'s contention that he did not misappropriate funds when he stopped payment on the check in 1975. Further, the Character Committee reaffirmed its finding that C.M. had converted funds of another during his bankruptcy. As to the Marteinsson suit, the Character Committee indicated that it was considered "as merely accusations, however they were considered in the totality of the applicant's background with respect to whether such allegations would inspire trust and confidence." Finally, the Character Committee was unpersuaded by C.M.'s explanation as to the admittedly false deposition testimony given in 1984.

On June 3, 1986, C.M. was afforded a full evidentiary hearing before the Board of Law Examiners. The Board members present were Charles H. Dorsey, Chairman, Robert H. Reinhart, John W. Sause, Jr., William F. Abell, and Deborah E. Jennings. C.M. was again represented by Albert Wynn, Esq.

At this hearing, C.M. was examined at length regarding his state of mind when he stopped payment on the check in 1975. The questioning with regard to this matter concluded with C.M. stating that he could not recall what his state of mind was when he wrote the check. However, his "aim was to get the carpet reinstalled so that [he] could get the house to settlement."

C.M. likewise faced intense questioning as to both his personal bankruptcy and the bankruptcy of Metro America. Contrary to his admissions before the Character Committee, C.M. suggested that he had filed for bankruptcy on behalf of Metro America because he wanted to avoid potential personal liability.

The Board was also interested in having C.M. explain his prior admission that he had given false testimony in a 1984 deposition. C.M.'s explanation was similar to that given to the Character Committee in February, 1986.

The Board, in an apparently unanimous report, concluded that C.M. did not meet his burden of proof that he possessed the requisite moral character and fitness to be admitted to the practice of law in this state. The Board specifically found that it would be hard pressed not to conclude that C.M. intended to stop payment on the check when he tendered the check for the delivery of carpet in 1975. In addition, the Board concluded that C.M. filed the bankruptcy petition on behalf of Metro America for the sole purpose of delay and had failed to act in a morally proper manner in the handling of funds he had received from the purchasers of the Hill Road property. Finally, the Board was not persuaded by C.M.'s explanations regarding his admittedly false deposition testimony. The Board noted

that each false statement in the 1984 deposition advanced C.M.'s interests in the only pending lawsuit in which he was involved and that C.M. was aware of the inconsistencies in his deposition hearing eight months prior to the proceedings of September, 1985. Accordingly, the Board declined to recommend C.M. for admission to the Maryland Bar.

It is important to note that C.M. brought the issue of Mr. Willoner's participation on the Character Committee panel to the Board's attention. While the Board did not specifically address this issue in its letter to this Court, the Board emphasized that since the Marteinsson suit had been settled, the allegations contained therein had no bearing on its assessment of C.M.'s fitness to practice law.

C.M. now has requested that this Court decide whether he has satisfied his burden of proving the requisite moral character and fitness for admission to the Maryland Bar. He also has questioned the propriety of Mr. Willoner's participation as a member of the Character Committee panel in the proceedings below. We address this latter issue first.

█ We find that Mr. Willoner should not have been named as a member of the Character Committee panel charged with investigating C.M.'s application for admission to the Maryland Bar. As we see it, this conclusion is palpably clear in light of the fact that Mr. Willoner is a partner in a small law firm which had filed a lawsuit on behalf of a client against C.M. This lawsuit was ultimately a topic of the Character Committee's inquiry.

Both the Character Committee and Mr. Willoner initially recognized the problem which Mr. Willoner's participation presented and he was relieved of the assignment of conducting a preliminary interview of C.M. However, between the preliminary interview and the first Character Committee hearing, a determination was made that since Mr. Willoner was not directly involved in the Marteinsson lawsuit, he could participate in the Character Committee proceedings. While Mr. Willoner's lack of direct involvement in the

Marteinsson lawsuit would provide some support for the argument that Mr. Willoner would be capable of evaluating the evidence presented at the Character Committee hearings in an objective fashion, the potential for Mr. Willoner to be unwittingly influenced or to influence others by his previous exposure to the facts of the Marteinsson lawsuit remained. In any event, the appearance of possible prejudicial influence should be avoided where practical. Thus, to fully protect C.M., and to ensure that the integrity and impartiality of the Character Committee process could not be questioned, Mr. Willoner should not have participated in the proceedings. *See Bd. of Med. Examiners v. Steward,* 203 Md. 574, 581–82, 102 A.2d 248, 251–52 (1954); *In re George G.,* 64 Md.App. 70, 75, 494 A.2d 247, 250 (1985).

Clearly, under ordinary circumstances, we would be constrained to remand this matter for a new Character Committee hearing. However, in this case, the Board has conducted what is in effect a *de novo* hearing and disregarded the Marteinsson issue and Willoner's participation in the Committee deliberations as having any impact on its findings and/or conclusions. We are, therefore, satisfied that the process afforded C.M. by the Board was sufficient to ensure C.M. that an unbiased record would be submitted to this Court for its review.

■ The Board ruled against recommending C.M. for admission to the Bar. While the Board's recommendation is entitled to great weight, it is incumbent on this Court to make its own independent evaluation of the applicant's present moral character based upon testimony and evidence submitted before the Character Committee and the Board. *In re Application of K.B.,* 291 Md. 170, 434 A.2d 541 (1981); *In re Application of A.T.,* 286 Md. 507, 408 A.2d 1023 (1979); *In re Application of Allan S.,* 282 Md. 683, 387 A.2d 271 (1978).

■ In regard to C.M.'s arrest for fraud by check, we agree with the Board that C.M. issued the check to purchase the replacement carpet with the intent to stop pay-

ment on the check once he received delivery of the carpet. C.M. was apparently experiencing financial difficulties at the time and it is questionable whether he had sufficient funds to cover the check when it was issued. Moreover, it is obvious that C.M. had no intent to repay the carpet company before he was arrested in 1977. Under the circumstances we find C.M.'s conduct inexcusable.

We are also concerned with the comments made by Judge Mannes of the Bankruptcy Court that C.M. had improperly utilized that court to delay foreclosure proceedings. Again, the root of the problem is C.M.'s inability to maintain financial stability. We reject C.M.'s arguments that any impropriety in regard to the bankruptcy proceedings was solely that of his counsel. To the contrary, we believe that C.M. was equally responsible for the substantive course of the proceedings and his credibility is accordingly brought into question.

Finally, we agree with the Board that C.M. was less than candid in explaining the inconsistencies in his 1984 deposition testimony. We note that C.M. never made mention, during the deposition, of his failure to review the medical bills and reports beforehand. Each of C.M.'s responses was unconditional. Furthermore, the deposition testimony would serve to benefit C.M. in the only remaining lawsuit he had pending at the time. These factors lead us to reject C.M.'s explanation for the false testimony. Even assuming that C.M. was suffering the effects associated with the consumption of contaminated drinking water at the time of the 1985 trial, C.M. admitted that he was aware of the inconsistency in his testimony several months before trial. C.M. should have instituted steps to correct the problem in advance of trial to negate the inference that he had violated his oath to testify truthfully.

Considering the totality of the circumstances we conclude that C.M. has not demonstrated the present good moral character necessary for his admission to the Bar of this State. We are satisfied that the Board's comprehensive

findings are correct; accordingly, C.M.'s application for admission is denied.

IT IS SO ORDERED.